UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL F. SOARES,

        Plaintiff,

    v.

JEFFREY LORONO, et al.,

        Defendants.

Case No.  12-cv-05979-WHO

**MEMORANDUM OPINION**

## INTRODUCTION

Plaintiff Paul F. Soares and defendants[1] Jeffrey Lorono, Lisa Lorono, Salinas Valley Roofing Incorporated ("SVR"), Adolfo Rangel, and Village Heating and Sheet Metal ("Village") have a long and acrimonious history, culminating in this consolidated civil action in federal district court and adversary proceeding in bankruptcy court.  Their relationship dates back to 2006, when Soares contracted with SVR, owned by Jeffrey Lorono, to provide work and materials on his Monterey apartment building.  A year later, Soares entered into an oral contract with Village, owned by Rangel, for sheet metal work on the roof.  After Soares breached both agreements, SVR and Village filed separate lawsuits against him in the Monterey Superior Court.  SVR and Soares reached a settlement agreement in 2008, which Soares ultimately breached through his failure to pay, spurring further litigation in the Superior Court.

Soares filed for bankruptcy in 2009.  SVR and Village brought an adversary complaint in the bankruptcy proceeding on October 26, 2009, alleging that the debts owed to them are non-dischargeable by reason of fraud.  *See generally Salinas Valley Roofing, Inc. v. Soares*, No. 09-

---

[1] Soares is the defendant and SVR and Village are plaintiffs in the bankruptcy proceeding.  I refer the parties as they are designated in the civil case.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    05296-ASW (Bankr. N.D. Cal. Oct. 26. 2009).  In 2012, Soares brought a complaint in federal

2    district court in New Jersey against the Loronos, SVR, Village, and Rangel[2] for breach of contract,

3    breach of warranty, and fraud.

4         The adversary case and civil case proceeded on separate tracks until September, 2014,

5    when the adversary case went to trial before U. S. Bankruptcy Judge Arthur Weissbrodt.  After

6    two days of trial, the substantial overlap between the adversary proceeding and the civil matter

7    became apparent, and Judge Weissbrodt directed the parties to raise the possible consolidation of

8    the matters with me.  I then consolidated the adversary proceeding with the civil case in this Court

9    since some of the underlying issues are the same in each case and Soares's civil claims serve as

10   potential defenses in the adversary proceeding.  *See* Dkt. No. 259.

11        On December 8, 2014, the case proceeded to trial without a jury.  In the civil proceeding,

12   Soares brought causes of action for breach of contract, breach of warranty, and fraud against

13   defendants Rangel and Village, and against defendants Lisa and Jeffrey Lorono and SVR.  In the

14   adversary proceeding, Village and SVR sought the establishment and liquidation of debts owed to

15   them and requested a finding of non-dischargeability of these debts pursuant to 11 U.S.C. §§

16   523(a)(2)(A) and 523(a)(6).  Although the parties had indicated that the trial would take several

17   days, it was completed on the day it began.

18        In this Memorandum of Decision, I issue my findings of fact and conclusions of law

19   pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  In the civil proceeding, I find that

20   Soares failed to meet the burden of proof for his claims of breach of contract and breach of

21   warranty because he did not prove damages or causation.  In addition, he failed to present any

22   evidence of fraud.  Therefore, I find against Soares and in favor of the defendants on all causes of

23   action in the civil proceeding.

24        In the adversary proceeding, the amounts of Soares's debts to SVR and Village are largely

25   undisputed.  I find that Soares owes a debt of $5, 697.00 to SVR and $14,517.36 to Village.  I

26   further find that both of these debts are non-dischargeable under Section 523(a)(6).  Soares has

27

28   _____

[2] Soares initially brought claims against several other defendants, who have all been dismissed
from the action.

engaged in an extensive pattern of wrongful conduct that was intentionally designed to avoid paying debtors such as SVR and Village, including using sham corporations that he formed abroad to insulate himself from liability.  SVR is entitled to attorney's fees pursuant to the Settlement Agreement between Soares and SVR, in an amount to be calculated after SVR files a motion for fees within 14 days of entry of judgment.

## FINDINGS OF FACTS[3]

### I.  THE PARTIES

1.  Plaintiff Paul F. Soares resides in Monterey, California.  Tr. 9:18.  Soares owns the four-unit residential apartment complex property involved in this case, located at 416 Drake Avenue in Monterey (the "Drake property").  *Id.* at 9:19-21, 99:15-20.  Soares lives in the largest unit of the Drake property.  *Id.* at 98:17-99:11.[4]

2.  Soares represented himself in these proceedings.  While not a lawyer, Soares obtained a masters' degree in International AgriBusiness from the University of Santa Clara, *see* Bankr. Tr. at 39:2-4, and has previously acted as a trustee for a pension fund.  *See United States v. Soares*, 998 F.2d 671, 671 (9th Cir. 1993).  He has been extensively involved in litigation in state and federal court, *see* Tr. Ex. 139 at 1-2, including as a pro se litigant in this bankruptcy proceeding, *see* Bankr. Tr. at 2, and before the Ninth Circuit in his prior criminal case for wire fraud, *see* Brief of Defendant-Appellant, *United States v. Soares*, 89 F.3d 847 (9th Cir. 1996) (No. 95-10359), 1996 WL 33487038.  He is not unsophisticated.

3.  Soares testified several times during the bench trial and the bankruptcy proceedings.  I do

---

[3] All of the findings of facts below are relevant to the adversary proceeding.  The facts found in sections I, V, and X are relevant to the civil proceeding, as are several facts that are identified and discussed in the conclusions of law addressing the civil proceeding.  I DENY any request for admission of evidence not previously addressed or relied upon in this memorandum opinion.  Defendants' request to offer additional evidence, made more than a week after the trial had concluded,  *see* Dkt. No. 328, is DENIED.

[4] I refer to the transcript from the trial on December 8, 2014 as "Tr."  At trial, I admitted the transcript of the aborted adversary bankruptcy trial before Judge Weissbrodt, without objection, and refer herein to the second day of bankruptcy trial held on September 18, 2014 as "Bankr. Tr."  I refer to all trial exhibits ("Tr. Ex.") by their exhibit number, regardless of whether they were submitted by the plaintiff, defendants, or as agreed exhibits.  Unless otherwise indicated, references to the bankruptcy docket refer to the case in *Salinas Valley Roofing, Inc. v. Soares*, No. 09-05296-ASW (Bankr. N.D. Cal. Oct. 26, 2009).

United States District Court
Northern District of California

United States District Court
Northern District of California

not find Soares to be a credible witness.  Soares's testimony during both the bench trial on December 8, 2014 and the bankruptcy proceedings on September 18, 2014 was often inconsistent or contradicted by reliable extrinsic evidence.  In addition, his memory was at times very detailed while at other times he was unable to remember important information, such as the fact that he was the general partner of Casa Vista, a key fact in his prior conviction for receiving kickbacks and embezzlement between 1991 and 1993.  *Soares*, 998 F.2d at 671.  Soares also pled guilty to wire fraud around 1996.  *United States v. Soares*, 89 F.3d 847 (9th Cir. 1996).  These are crimes affecting a witness's truthfulness, *see* FED. R. EVID. 609, and while I find Soares not credible without regard to his conviction, the fraud conviction is admissible and relevant even  if it took place over ten years ago.  The sophistication of the schemes proven there are of the same genre as those in this case.  *See* FED. R. EVID. 609 advisory committee's note (criminal fraud and embezzlement "involve[] some element of untruthfulness, deceit or falsification bearing on the accused's propensity to testify truthfully").

4.   Defendant Jeffrey Lorono owned defendant SVR, a roofing company that is now dissolved.  Tr. 33:18-34:2.  Jeffrey Lorono is married to defendant Lisa Lorono.  *Id.* at 246:20-21.  At the time of the roofing contracts at issue, Lisa Lorono was the secretary of SVR.  *Id.* at 247:2-5.

5.   I heard testimony from both Jeffrey and Lisa Lorono, and find that they were credible in their testimony.

6.   Defendant Village is a sheet metal business owned by defendant Adolfo Rangel.  *Id.* at 150:23-151:23.  Rangel is a licensed contractor for sheet metal working, heating, and air conditioning.  *Id.* at 239:18-25.  He has held a license continually since 2002.  *Id.* Although Rangel's contracting license was suspended several times in the past, the license was not suspended at the time of his contract with Soares or when he performed under the contract.  *Id.* at 243:3-23.

7.   I heard testimony from Rangel and find that he was a credible witness.

## II.  NZH AND OCC

8.   New Zealand Holdings, Limited ("NZH") and Oceania Capital Company, Limited ("OCC") are corporations formed in the Cook Islands.  Bankr. Tr. 37:17-22.  NZH registered with the California Secretary of State on March 7, 2001, and OCC registered on April 27, 2006.  Tr. Ex. 216; Tr. Ex. 215.

9.   Soares initially testified that that he formed OCC and NZH for the purpose of converting an apartment building – the Drake property – to condominiums.  Bankr. Tr. at 37:23-25.  He stated that the "apartment building had some defects in it, and to my knowledge, it is a standard practice to form corporations either in other states or in other jurisdictions . . . so that those corporations, once the condominiums are sold, are dissolved to avoid any homeowners' association lawsuits in subsequent years."  *Id.* at 37:24-38:6.

10.  During the bench trial, Soares denied that he formed the corporations.  Tr. 82:12-16.  Instead, he maintained that they were formed by an individual named Mr. Short in order to convert the Drake property into condominiums.  *Id.* at 93:6-9.  I credit Soares's earlier testimony and find that Soares formed the corporations, possibly with Short.

11.  Short works in the asset protection business and had offices in New Zealand and the Cook Islands.  *Id.* at 81:10-19.  Soares testified that he "got involved" with Short in order to form a trust for his children.  *Id.*  According to Soares, Short owned NZH and OCC.  Bankr. Tr. at 40:16-19.

12.  In 2006, at Soares's request, the Monterey Superior Court set aside a judgment against Soares personally because NZH, and not Soares, was a party to the contract.  Tr. Ex. 146; Tr. 174:7-176:22.  That lawsuit involved a tenant of the Drake property who sued both Soares and NZH for the return of his security deposit.  Tr. Ex. 146; Tr. 174:7-176:22.

13.  According to Soares, until 2007 the mortgages on the Drake property were paid by OCC and proceeds from the sale of the condos were paid to OCC's investors.  Tr. 94:8-96:9.  In 2007, Soares "refinanced" the Drake property by obtaining personal mortgages on it.  *Id.* at 93:6-95:10.  Thereafter, Soares admitted at trial, OCC's only asset was the Drake property and the assets and liabilities of OCC were the same as those of Soares personally.  *Id.* at

1    90:23-91:18, 218:7-18.

2    14.   Soares was the president, chief executive officer, and a director of both corporations, and

3          signed deeds on their behalf. *Id.* at 84:1-8; Bankr. Tr. at 44:11-16.  According to Soares,

4          decisions about conveyancing the Drake property were made by Short and the board in

5          New Zealand or the Cook Islands.  Tr. 84:9-13.  However, Soares testified that he could

6          not recall the names or even the number of OCC's owners.  *Id.* at 93:17-94:4.  Given the

7          evidence of Soares's control over the corporations, I do not believe Soares's testimony that

8          decisions were made by Short and the board, or his testimony that proceeds from the

9          condos were paid to OCC's "investors."

10   15.   Soares initially testified that he first acquired an interest in NZH and OCC in May or June

11         of 2009, after which he owned a 100 percent interest in NZH and OCC.  Bankr. Tr. at

12         42:5-45:2.  He also testified that he did not pay any consideration for his interest in the

13         corporations.  *Id.*  Soares stated that he acquired an interest in the companies so that they

14         could be dissolved.  Tr. 83:11-13.

15   16.   Soares and Short signed and filed certificates of dissolution for OCC and NZH on or

16         around June 18, 2009.  Tr. Ex. 217 at 2; Tr. Ex. 218 at 2.  These were received by the

17         California Secretary of State on July 22, 2009.  Tr. Ex. 217 at 1; Tr. Ex. 218 at 1.

18   17.   Each certificate of dissolution stated that "[t]he corporation's known debts and liabilities

19         have been adequately provided for by their assumption and the name and address of the

20         assumer is Paul F. Soares."  Tr. Ex. 217 at 2; Tr. Ex. 218 at 2.

21   18.   On July 23, 2009, Soares filed a "Notice of Automatic Stay in Bankruptcy" in the Superior

22         Court case brought by SVR (M86548).  Tr. Ex. 213.  This requested that the court take

23         judicial notice of the fact that defendants' counsel, David Hollingsworth, "appears to have

24         successfully argued that all Defendants are one and the same and that each and every

25         corporate defendant is a sham and is the alter ego of Paul F. Soares."  *Id.*  Soares requested

26         that the matter be subject to stay.  *Id.*

27   19.   The carefully worded Notice in fact induced the Monterey Superior Court to enter a stay,

28         *see* Tr. 178:9-23, 184:10-15, and was at minimum an attempt to avoid debt to creditors of

United States District Court
Northern District of California

OCC and NZH by placing them under the umbrella of the bankruptcy protection, if not a judicial admission that the companies are alter egos of Soares.

20. During the bankruptcy proceedings, Soares testified that before 2009, he never owned any interest in either NZH or OCC. Bankr. Tr. at 42:9-44:9.

21. In a 2008 letter to his creditors, Soares also asserted that he never owned any interest in either NZH or OCC. Tr. Ex. 204.

22. During the time that OCC owned the Drake property, Soares entered into a contract with California Closets for installations on the Drake property units. Tr. Ex. 301. This contract was signed by Soares individually and did not mention OCC. *Id.* Soares testified that OCC paid for the work that went into rental units aside from his own. Tr. 135:22-136:10.

23. In 2009, Soares shared a post office box with both OCC and NZH. *Id.* at 97:20-24. At that time, Soares's testimony reflects that he cannot recall whether he wrote a check related to the settlement agreement with SVR from his personal account or OCC's account. *Id.* at 91:19-23, 97:13-19.

24. I find that NZH and OCC are alter egos of Soares. Soares entered all contracts for the repairs and improvements of the Drake property, sometimes in a personal capacity; paid no consideration for his ultimate ownership of the property; shared a mailbox with OCC and NZH; and was often unable at trial to distinguish between his personal affairs and those of OCC and NZH. This creates a unity of interest and ownership such that the separateness of Soares and the corporations ceased as a practical matter.

25. Although Soares asserts that consideration for the transfer of the Drake property to his name was the assumption of all debts on the property, a substantial portion of these debts – including two mortgages – were his personal debts. The short term "transfer" in 2007, which allowed Soares to obtain such financing, was made by OCC without any consideration.

26. Short and the other unnamed directors and shareholders of OCC and NZH serve as a pretense to give the appearance of distinct entities when in reality Soares alone controlled both companies as his alter egos. Short, who lives overseas, had no meaningful role in the

1  operations of OCC and NZH, whose businesses focused on the Drake property in

2  Monterey.  As Soares testified, Short works in "asset protection" and initially assisted

3  Soares in forming a trust for his children.  Short served as a director of NZH and OCC only

4  in order to maintain the appearance that the corporations were separate entities, when in

5  reality they were not.

27.  Soares's substantial use of the corporations to obtain personal financing and other benefits

   from third parties, combined with his repeated claims that he has no interest in them, leads

   me to find that Soares used the corporations in order to avoid personal debts that he either

   was unwilling or unable to pay.

## III. SOARES'S INVOLVEMENT WITH OTHER BUSINESSES

28.  In the past, Soares has been a director, president, or partner of between 20 and 40

   businesses.  Bankr. Tr. 39:12-40:3.

29.  A corporation called Cgambo Development Company Incorporated ("Cgambo")

   previously held title to the Drake property.  *Id.* at 47:23-48:2.  According to Soares, he had

   no relationship with the company until its principal, Carl Graham, died.  *Id.*; Tr. 196:19-

   197:23.

30.  Soares signed a grant deed conveying the Drake Property to NZH as president of Cgambo

   in 2000.  Tr. Ex. 131.

31.  In the bankruptcy proceedings a creditor of Cgambo, Homer T. Hayward Lumber Co.,

   filed a claim against Soares on the basis that Cgambo was Soares's alter ego.  Tr. Ex. 306.

   at 2.

32.  Soares was involved in 3 lawsuits that also involved Cgambo in 2000 and 2002.  Tr. Ex.

   139 at 1.

33.  Soares controlled a corporation called Casa Vista Limited Partnership ("Casa Vista").

   *Soares*, 998 F.2d at 672.  Soares was convicted of receiving kickbacks in his fiduciary

   position as the investment advisor for an employee pension plan, in part through his work

   with Casa Vista.  *Id.*

34.  Soares was involved as a co-defendant with a company called Duke & Rosie's in three

8

lawsuits in 2003, 2005, and 2008.  Tr. Ex. 139 at 1.  The last of these lawsuits named Duke & Rosie's as Soares's dba.  *Id.*  In letters written by Soares in 2008 and 2009, he denied having any interest in Duke & Rosie's, but stated that the company was owned by OCC. Tr. Ex. 204; Tr. Ex. 205.

35.  During the bankruptcy trial, Soares testified that he held a five percent interest in a general partnership that owned Carpodeum Limited Partnership ("Carpodeum").  Bankr. Tr. 49:7-17.  Soares's brother was the major partner of the general partnership.  *Id.*

36.  Soares also stated that he and his brother each held a five percent interest in Presidio Hill Group ("Presidio").  *Id.* at 50:8-17.

37.  Soares has been a party as a plaintiff or defendant to 23 lawsuits in the California superior courts.  Tr. 170:15-171:6; Tr. Ex. 139 at 1.  Many of these lawsuits involved corporations with which Soares was affiliated, including Casa Vista, Carpodeum Limited, Cgambo, Duke & Rosie's, NZH, and OCC.  Tr. Ex. 139 at 1.

38.  Soares has been involved in at least a dozen bankruptcy cases as a debtor.  Tr. 171:19-173:21; Tr. Ex. 139 at 2.  These include proceedings with Carpodeum, Cgambo and Casa Vista as debtors.  Tr. Ex. 139 at 2.

## IV. THE DRAKE PROPERTY

39.  The Drake property consists of a roughly 6,000 square foot unit that is Soares's residence, two 1,000 square foot one-bedroom apartments, and one 700 square foot studio apartment. Tr. 98:13-99:20.

40.  Soares personally collects rent from the tenants living in the Drake property units that he does not live in.  *Id.* at 99:21-100:1.

41.  According to Soares, he paid $4,000.00 in monthly rent to NZH and then OCC until 2008, after which he made payments toward the deed of trust on the property.  *Id.* at 100:2-103:21.

42.  On a number of occasions, Soares denied ever having an interest in the Drake property. This includes during a deposition on April 17, 2008, *see* Tr. 156:16-157:9, and in his pleadings in the Superior Court.  Tr. Ex. 112 at 2.

United States District Court
Northern District of California

43. In addition, in the bankruptcy proceeding Soares testified that he first acquired an interest in the Drake property in 2009, approximately six to eight weeks before he filed for bankruptcy.  Bankr. Tr. 44:23-25.

44. The Drake property was granted to Soares on July 8, 2009.  Tr. Ex. 126.  This deed is signed by Soares as the president of OCC.  *Id.*

45. The Drake property was also granted to Soares from OCC on June 28, 2007.  Tr. Ex. 127. Again, Soares signed the deed as the director of OCC.  *Id.*  On the same day, Soares as an individual transferred the Drake property back to OCC.  Tr. Ex. 128.  A handwritten note on this deed indicates that the transfer was for "financial purposes."  *Id.*

46. When confronted with the 2007 deed, Soares admitted that this transfer took place and that he owned the Drake property for "approximately one week."  Bankr. Tr. 58:2-7.  Soares stated that the conveyance took place so that he could obtain a loan from Triton Commercial Capital.  *Id.* at 58:8-17; Ex 304.  The loan from Triton Commercial Capital, dated June 27, 2007, was made to Soares personally.  Tr. Ex. 304.

47. Soares also obtained a loan on the Drake property on May 7, 2007, before title was transferred from to him from OCC.  Tr. Ex. 303 at 1.  This deed of trust was made in OCC's name.  *Id.*

48. Soares admitted that by the time OCC transferred the Drake property to him in 2009, the mortgages and other debts against the Drake property were all his personal debts.  Tr. 90:18-91:9.

49. Soares also held title to the Drake property in 1984.  Tr. Ex. 135; Tr. Ex. 136.

50. Soares's statements that he did not have any interest in the Drake property before 2009 were false.  Soares's multiple assertions that he did not own the property, even when presented with information to the contrary, undermine his argument that he forgot about owning the property.  I find that Soares knew he had previously owned the property but claimed he did not in order to avoid personal liability for debts incurred upon the property and in order to avoid the appearance that his corporations were alter egos.

51. Soares initially stated that he did not pay any money to OCC for the property, but assumed

10

1   the debts of the property as consideration.  Tr. 164:4-14.  Soares then recanted his

2   testimony and testified that he paid roughly a quarter of a million dollars in January of

3   2009.  *Id.* at 165:20-166:21.  He did not provide any evidence as proof of this payment.  *Id.*

4   at 166:14-18.

5   52.  OCC obtained the Drake property from NZH on May 18, 2006.  Tr. Ex. 129.  Soares

6   signed the deed as the director of NZH.  Tr. Ex. 129.

7   53.  NZH obtained the property from Cgambo on May 15, 2000.  Tr. Ex. 131.  Soares signed

8   this grant deed as president of Cgambo.  *Id.*

9   54.  Cgambo was granted the property from Casa Vista on December 4, 1997.  Tr. Ex. 132.

10   Soares signed this deed on behalf of Casa Vista as the General Partner.  *Id.*

11   55.  Casa Vista obtained the property from Presidio on June 20, 1985.  Tr. Ex. 133.  Soares

12   signed this deed as the General Partner of Presidio.  *Id.*

13   56.  Presidio obtained the property from Soares as an individual on March 8, 1984.  Tr. Ex.

14   134.  Soares had obtained the property from his wife, Sharon Soares, on February 16,

15   1984.  Tr. Ex. 135.  A grant deed dated February 14, 1984 also conveyed title to Soares

16   from Arthur and Isabell Jones.  Tr. Ex. 136.

17   57.  Soares stated that he could not recall if he was the general partner of Presidio or Casa

18   Vista, and could not recall if he was the president of Cgambo at the time it conveyed the

19   Drake property to NZH.  Bankr. Tr. at 53:10-54:10.

20   58.  Soares testified that at the time NZH acquired the Drake property from Cgambo, he had no

21   ownership interest in NZH.  *Id.* at 54:11-13.  Soares stated that he did not recall if he was

22   the director of NZH when the deed was signed.  *Id.* at 56:7-11.

23   59.  Considering the facts that Soares signed every deed of conveyance for the Drake property

24   on behalf other corporations, and at times transferred it to himself, I do not believe

25   Soares's testimony that Short, and not he, made decisions about conveying the Drake

26   property.

27   60.  I find that Soares exercised control over all conveyances of the Drake property since it was

28   sold by the Joneses in 1984.  It is not believable that Soares did not remember the fact that

11

he signed every one of the deeds conveying the Drake property.  Like NZH and OCC, the various corporations that conveyed the Drake property were likely alter egos of Soares. Soares's repeated statements that he had no interest in the Drake property were false and were made in bad faith in order to avoid paying debts incurred on the Drake property.

## V.  THE ROOFING CONTRACTS

### A.  With Lisa Lorono, Jeffrey Lorono, and SVR

61. On February 24, 2006, SVR submitted a "Proposal and Contract" to "Sirus Forest"[5] which proposed to furnish material and work for the replacement of the roof on the Drake property.  Tr. Ex. 101 at 1.

62. The Proposal and Contract was signed by Jeffrey Lorono on behalf of SVR and by Soares on behalf of NZH on March 1, 2006.  *Id.* at 2.  This document provided that there was a "ten year warranty on workmanship."  *Id.* at 1.  It also provided that Soares would pay 50 percent of the purchase price down, and 50 percent upon completion.  *Id.*; Tr. 255:2-5.

63. On or around July 2, 2006, Soares signed another Proposal and Contract from SVR with similar terms, this time on behalf of OCC.  Tr. Ex. 102.  This also stated that there was a "ten year warranty on workmanship."  *Id.*  It also stated that 50 percent would be paid when "material is loaded," with the balance due on completion.  *Id.*

64. Soares stopped payment on the contracts with SVR (collectively referred to as the "Proposal and Contract") after paying the first 50 percent.  Tr. 252:22-253:22.

65. After Soares failed to pay the remaining balance, SVR ceased paying its supplier.  *Id.* at 252:18-20.  Because Soares did not pay within 60 days of completion of the project, a mechanic's lien was filed against the Drake property.  *Id.* at 254:15-22, 256:2-11.

66. When Lisa Lorono attempted to obtain payment from Soares and went to his house, he stood at the window but would not open the door.  *Id.* at 248:8-16.  Soares repeatedly made verbal promises to pay the Loronos that he failed to fulfill.  *Id.*

67. Soares maintains that his signature on the Proposal and Contract with SVR was "forged."

---

[5] This appears to be a mistake, corrected by the second Proposal and Contract, which crossed out the name "Sirus Forest" and replaced it with OCC.  Ex. 102.

United States District Court
Northern District of California

1     *Id.* at 105:16-106:3.  Soares admits that the signature was his but claims that it – as well as

2     his fax number – was pasted on the document without his consent.  *Id.* at 106:1-107:18.

3     68.   According to Lisa Lorono, Soares's signature on the fax was not forged or unlawfully

4           pasted onto the fax.  *Id.* at 248:17-249:10.

5     69.   I find that Soares's signature was not forged or unlawfully pasted onto the contract with

6           SVR.  The parties do not dispute the existence of an agreement for roofing work.  Soares

7           has not presented any evidence to support his contention that there was a scheme by which

8           both the signature and fax number were "pasted" onto the document, and Lisa Lorono

9           denies any bad faith conduct on her part.

10          **B.  With Village and Rangel**

11    70.   In 2007, Soares entered into an oral contract to provide work on the Drake property roof

12          with Rangel, who acted on behalf of Village.  *Id.* at 239:18-240:21.

13    71.   When making the oral agreement, Soares did not say that he was acting as an agent of any

14          corporation, and indicated to Rangel that he entered into the contract personally.  *Id.*

15          Soares represented to Rangel that he was the party that would pay Rangel in exchange for

16          his services.  *Id.*

17    72.   Soares does not deny owing money to Rangel, but asserts that he did not have the money

18          to pay the remaining balance.  *Id.* 153:3-19.

19    73.   Rangel claims that the debt owed to him amounts to $13,124.54 plus interest, equaling

20          $14,517.36.  Tr. Ex. 208; Bankr. Dkt. No. 1 at 6; Tr. 244:6-11.  Soares did not, and has not

21          to date, paid any of this sum to Rangel.  Tr. 241:20-242:3; Tr. Ex. 208.

22    74.   Soares claims that the balance owed to Rangel is around $11,000.00.  Tr. 154:8-10.

23          Soares's account differs from Rangel's claimed debt of $14,517.36 (which Soares also

24          recognized as valid) because Soares subtracted about $2,000.00 from the initial debt due to

25          "problems" with the copper work that he estimated would cost about $2,000.00 to repair.

26          Tr. 154:5-10.

27    75.   Soares also testified that he did not hire Rangel, notwithstanding his admission of debt to

28          Village.  *Id.* at 154:18-21.

United States District Court
Northern District of California

1    76.  Soares has argued that Rangel was not licensed and that therefore he does not have

2         standing to sue.  Dkt. No. 309 at 2; Tr. 243:3-23.  The evidence supports a contrary

3         conclusion that Rangel was licensed.   Tr. 239:22-240:2, 243:17-23.

4    **VI. MONTEREY COUNTY COURT PROCEEDINGS**

5         **A.  Between Rangel and Soares**

6    77.  Rangel filed an action in case number M93920 against Soares in the Monterey Superior

7         Court in 2008.  Tr. Ex. 220.

8    78.  In his defense of the M93920 case, Soares claimed that the contract with Village was made

9         with NZH and OCC, and not with him personally.  *Id.* at 2, 6.

10   79.  On January 12, 2009, Soares sent an email to Rangel's lawyer, David Hollingsworth,

11        stating that

12             . . . neither Mr. Rangel, personally, nor Rangel dba Village Heating
               and Sheet Metal did any work on the property at 416 Drake and they
13             are the plaintiffs in the matter.

14             A company named Rangel Heating Ventilating Air Conditioning, a
               California Corporation, dba Village Heating and Sheet Metal did the
15             alleged work at 416 Drake Avenue, and even if they did the work,
               their Fictitious Business Name Statement expired and was not
16             renewed on December 2, 2007.  The above named corporation does
               not own the dba thereafter, because they did not publish as required
17             and forfeited the company name, which is now owned by New
               Zealand Holdings Ltd.
18

19        Tr. Ex. 151.  Soares claimed that Village should be dismissed for lack of standing.  *Id.*

20   80.  At trial, Soares testified that he attempted to acquire the dba because he wanted to draw

21        Rangel's attention to the fact that "he's not doing business as a sole proprietor; he is a

22        corporation."  Tr. 151:20-21.  The court does not credit this testimony as truthful.  The

23        above email indicates that Soares attempted to acquire Village's dba in order to avoid its

24        debt to Village, and that he used NZH as an alter ego of himself.

25   81.  Rangel's case against Soares was stayed when Soares filed for bankruptcy.  Bankr. Dkt.

26        No. 1 at 6.

27        **B.  Between SVR and Soares**

28   82.  SVR filed case number M86548 against Soares in the Monterey Superior Court in order to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    enforce the mechanic's lien on the Drake property.  Tr. Ex. 112.

2   83.   On January 21, 2008, Soares, represented by counsel, filed a "Cross-Complaint to Quash

3         Lien and Remove Cloud on Title and for Damages."  *Id.* at 1.  It asserted that: (i) OCC was

4         the sole owner of the Drake property; (ii) Soares did not have and never had any interest in

5         the Drake property; (iii) the February 24, 2006 Proposal and Contract was never accepted

6         by OCC and did not reflect the agreement between OCC and SVR; (iv) Soares's signature

7         on the document was forged; (v) NZH did not own and did not contract for improvements

8         on the Drake property; (vi) the July 2, 2006 Proposal and Contract was not valid because it

9         was not signed by SVR and there was no indication that Soares was the director of OCC;

10        and (vii) there was never a written agreement between OCC and SVR.  *Id.* at 1-4.

11   84.  The Cross-Complaint also included a cause of action for fraud on the basis that SVR

12        forged Soares's signature on the contracts, and converted payments made by Soares to its

13        own use instead of paying the manufacturer.  *Id.* at 9.

14   85.  The Cross-Complaint further alleged that SVR destroyed a $20,000.00 sculpture by

15        Fletcher Denton and a $20,000.00 mink coat.  *Id.* at 11-12.

16   86.  After SVR filed an insurance claim in order to defend against Soares's lawsuit for damages

17        to the sculpture, Soares claimed he was entitled to the insurance proceeds.  Tr. 126:12-

18        128:2; 221:18-222:4.  At the pretrial conference on November 21, 2014, I ruled that this

19        dispute would generally not be admissible at trial, but stated that I would determine later

20        whether the insurance payment might be treated as a setoff for attorney's fees.  Dkt. No.

21        311.[6]

22   87.  Soares admitted during the bench trial that there was a valid written roofing agreement for

23        the Drake property between OCC and SVR.  Tr. 114:7-8.  Yet when confronted with his

24        prior inconsistent position in the Cross-Complaint, he continued to maintain that SVR did

25        not provide a valid written contract but instead forged his signature on the Proposal and

26        Contract, which did not represent the true agreement of the parties.  Tr. 112:5-20, 114:7-

27

28   [6] I will determine whether it is appropriate to offset the insurance proceeds from any attorney's fees after considering the parties' motions for and in opposition to attorney's fees.

15

1    115:5; Tr. Ex. 112 at 9.

88.  On July 29, 2008, the parties announced that they had reached a settlement agreement in the case.  Tr. Ex. 202 at 1-3.

89.  On August 6, 2008, the court ordered that Soares pay $45,000.00 in attorney's fees to SVR through the date of settlement on July 29, 2008.  Tr. Ex. 214.

90.  On September 12, 2008, the court indicated that "as of today, the court does not find bad faith on the part of any party."  Tr. Ex. 3.

## VII.   THE SETTLEMENT AGREEMENT

91.  In September of 2008, Soares, NZH, OCC, SVR, and the Loronos signed a settlement agreement reflected in two documents entitled "Agreements to Release and Distribute Proceeds of Mechanic's Lien Bond" and "Global Settlement and Release" (collectively referred to as the "Settlement Agreement").  Tr. Ex. 201.

92.  The Settlement Agreement purported to resolve the case brought by SVR in M86548.  *Id.* at 1.  It also addressed a pending action brought by ALL Roofing Materials ("ALL") against Soares and OCC.  *Id.*

93.  Under the Settlement Agreement, Soares agreed to pay $36,500.00 to ALL, and $18,651.72 to the plaintiffs' lawyer, David Hollingsworth, in attorney's fees.  *Id.* at 2. These funds were to be disbursed from a bond that Soares obtained from American Contractors Indemnity Company.  *Id.* at 1-2.

94.  Soares also agreed to a future payment of the remaining $26,000.00 of the $45,000.00 in attorney's fees awarded in the Superior Court in exchange for dismissal of M86548.  *Id.* at 2-3.

95.  The Settlement Agreement acknowledged that Soares had paid SVR a balance of $11,994.00.  *Id.* at 2.

96.  The Settlement Agreement provided that:

> In consideration of the foregoing agreement, each party. . . hereby irrevocably release[s] each and every other party . . . from any and all claimed liability of any kind for any acts or omissions arising out of relations between the parties, of whatsoever nature, from the beginning of the world to the date of these presents and shall also extend to any claims for any injuries or damages, including any

United States District Court
Northern District of California

United States District Court
Northern District of California

1  attorney's fees or costs, proximately or indirectly caused by matters
2  related to the subject matter of the dispute, whether such claims be
   legal or equitable in nature, arising out of tort or contract, and
   whether or not enumerated in this release.

3  *Id.* at 3.  However, it provided an exception for "liability by SVR for its guarantee on

4  roofing materials and work." *Id.*

5  97.  The agreement also stated that "[i]n the event any action is necessary to enforce any of the

6  terms, covenants or conditions of this release, the prevailing party shall, in addition to any

7  other recovery, recover his, her, its, or their reasonable attorneys' fees and costs." *Id.* at 4.

8  **VIII.  SOARES'S EFFORTS TO PAY UNDER THE SETTLEMENT AGREEMENT**

9  98.  On October 17, 2007, Soares obtained a release of lien bond from American Contractors

10  Indemnity Company.  Tr. Ex. 207.

11  99.  SVR received a sum of $18,651.72 from Soares as provided in the Settlement Agreement

12  on or around September 26, 2008.  Tr. Ex. 155 at Ex. B.

13  100. On October 23, 2008, Soares sent a letter expressing a willingness to work out a payment

14  plan with the unnamed creditors to which it is addressed.  Tr. Ex. 204.  In this letter, Soares

15  stated that he had no personal interest in NZH, OCC, or Duke & Rosie's.  *Id.* at 1.  In a

16  letter to attorney Hollingsworth, dated January 8, 2009, Soares stated that the balance

17  remaining to SVR was around $7,000.00.  Tr. Ex. 205.  He wrote, "I have given you all the

18  cash over the past 4 months that was available to me and to Oceania." *Id.*  Soares's letter

19  also indicates a unity of interest between OCC and Soares.

20  101. On July 30, 2009, Soares sent a letter to Hollingsworth, the Loronos, and SVR, requesting

21  that they agree to alternative dispute resolution with the bankruptcy court.  Tr. Ex. 206.

22  102. Soares testified that at the time he filed for bankruptcy, OCC and NZH did not owe any

23  money under the Settlement Agreement.  Tr. 86:7-17.  According to Soares, SVR filed a

24  claim for around $6,000.00 in 2009 against Soares alone, thus waiving all claims against

25  the corporate entities.  *Id.* at 87:1-90:9.  Soares had no reasonable basis for this assertion.

26  In the relevant filing, SVR named Soares, OCC, and several other parties as defendants.

27  *See* Tr. Ex. 154 at 1.  Soares's incorrect assertion that the corporations did not owe any

28  money under the Settlement Agreement suggests an attempt to avoid his debts.

17

103. Soares admitted to owing $5,697.12 under the Settlement Agreement.  Tr. At 91:1-2; Ex. 53 at 3.  However, he appears to take the position that this is owed not to SVR but to Hollingsworth as attorney's fees.  Tr. 48:6-49:19.  SVR contends that it has incurred additional attorney's fees in attempting to collect this sum.  Ex. 155 at 1.

## IX. BANKRUPTCY PROCEEDINGS

104. Soares filed for Chapter 11 bankruptcy in 2009.  Tr. 10:1-14, 191:3-4.

105. SVR and Village filed the present adversary complaint in the bankruptcy court on October 26, 2009.  Bankr. Dkt. No. 1.

106. In recommending that the case be converted to a Chapter 7 proceeding, the U.S. Trustee stated that Soares "has not made any serious effort to sell or refinance his residence, and has not demonstrated that he has any reasonable likelihood of rehabilitation."  Tr. Ex. 125 at 4.  It also cited Soares's "desire to avoid creditors."  *Id.* at 6.

107. Soares's Chapter 11 proceeding was converted to a Chapter 7 proceeding on September 12, 2011.  Bankr. Dkt. No. 183 at 2.

108. On September 18, 2014, SVR and Village's 11 U.S.C. § 523 claims proceeded to trial in the bankruptcy court.  Bankr. Tr. at 1.  The court suspended trial upon learning of the pending civil action in this Court.  *Id.* at 63:3-64:19.  I ultimately consolidated the actions, and heard SVR and Village's Section 523 claims during the bench trial on December 8, 2014.  *See* Dkt. No. 259.

## X. CIVIL PROCEEDING

109. Soares testified that he discovered problems with his roof in 2009.  Tr. 10:7-14.  In particular, he noticed that shingles were peeling off the roof and falling into his yard.  *Id.* at 10:23-25.

110. Soares counted thirteen shingles that fell into the yard in one month, *see id.* at 14:10-11; Jeffrey Lorono counted eight tabs that were either missing or peeling.[7]  *Id.* at 36:20-24.

111. Soares filed a complaint in the current civil proceeding on May 16, 2012.  Dkt. No. 1.

---

[7] There are three tabs in a shingle.  Tr. 71:22.

1   Soares requested over $11 million in damages.  Tr. 22:2-4.

2   112. Soares initially filed this case in the District of New Jersey.  *See* Dkt. No. 1.  He testified

3   during trial that this was a "mistake," and that he filed in New Jersey because one of the

4   parties was based in New Jersey.  Bankr. Tr. 35:21-25.  The parties remaining in this case,

5   as well as the Drake property, are all located in Monterey, California.

6   113. Soares testified that he hired a roof inspector, Pete Scudder, to inspect his roof

7   approximately one year after he filed the present lawsuit.  Tr. 11:8-10, 17:3-14.  However,

8   Soares's Rule 26 disclosures in this case indicate that Scudder's observation report is dated

9   April 2, 2012.  Tr. Ex. 140 at 5.

10  114. Scudder prepared a written observation report.  *Id.* at 5-6.  This stated that the roof

11  appeared to be installed according to most of the manufacturer recommendations, although

12  there were several areas of concern that needed further investigation.  *Id.* at 5.  This would

13  require "destructive testing," or physically removing shingles to examine the application,

14  and contacting the manufacturer of the shingles.  *Id.* at 6.

15  115. The report stated that the shingles were installed using four copper fasteners or nails,

16  although if the building was in a high wind zone good practice calls for six fasteners.  *Id.* at

17  5.

18  116. The report highlighted several areas of potential concern, including that (i) the clear

19  adhesive strip on the shingles was not removed, which could affect whether the roof

20  properly adheres to the eaves; (ii) in some areas the nails were nailed higher than

21  recommended; (iii) several shingles were missing or damaged; (iv) seven shingles were

22  delaminating, apparently due to a manufacturing defect; (v) the chimney needed additional

23  caulking; (vi) a blower vent cap needed to be replaced; (vii) ventilation was outdated and

24  potentially inadequate; and (viii) there were some exposed or caulked fasteners.  *Id.* at 5-6.

25  117. The report also noted installation of parts of the roof called "valleys" in a manner that

26  would require approval by the manufacturer to ensure a correct installation procedure.  *Id.*

27  at 6.

28  118. The report stated that due to "numerous unanswered questions," more testing was required.

19

United States District Court
Northern District of California

*Id.* There is no evidence that Scudder performed more testing, and therefore his testimony regarding any problems that might have been the responsibility of the defendants was inconclusive.

119. An addendum to Scudder's report states that the adhesive membrane appeared to have been installed correctly. *Id.* at 7. It also did not find that there was water intrusion into the attic. *Id.* The addendum expressed concern that some nails were "backing out," although the exact reason for this was not known. *Id.* It recommended further inspection by a manufacturer. *Id.* at 8.

120. In his deposition, Scudder testified that he had inspected the roof once and his colleague had tested the roof once. Scudder Depo. at 7 (Dkt. No. 318).

121. Scudder stated that there was a history of a leak at one place on the roof. *Id.* at 9.

122. Scudder also testified that he did not know whether the Drake property was in a high wind zone, although he would guess it was not in a high wind zone. *Id.* at 10.

123. Scudder testified that the nails that were higher than recommended were only in isolated areas and not throughout the roof. *Id.* at 13.

124. According to Scudder, many things could cause missing roof shingles, from raccoons or the wind to someone walking on the roof. *Id.* at 15-16. He could not give any opinion as to what caused the missing shingles on Soares's roof. *Id.* at 16.

125. Scudder testified that caulking could be done by either a roofer or a sheet metal contractor. *Id.* at 24. To fix the caulking on Soares's roof, he estimated that it would cost between $200.00 and $250.00. *Id.*

126. Scudder did not know when the blower vent cap or the roofing vents were installed. *Id.* at 26-28. He also could not specify the cause of the nails "backing out" or whether they had caused any problems with the roof. *Id.* at 35-36, 54.

127. Scudder testified that the entire roof should not be replaced. *Id.* at 41.

128. According to Soares, Scudder told him that it would cost less than $1,000.00 to fix the shingles that were loose on the roof. Tr. 24:4-5.

129. Jeffrey Lorono testified that he did not know if someone "slapped" the shingles to put a

20

1  curve in them, or warmed the shingles.  *Id.* at 37:6-38:5.  He did not recall whether he or

2  his roofers used a product called Geocel.  *Id.* at 38:19-25.  He did not know if he or his

3  roofers "trimmed the exposed area of the starter course on the eave of the roof."  *Id.* at

4  40:22-25.

5  130.  Lorono also testified that SVR, and not Rangel, installed the valleys on Soares's roof.  *Id.*

6  at 45:18-23.

7  **CONCLUSIONS OF LAW**

8  **I.   CIVIL PROCEEDING**

9     **A.  Breach of warranty**

10     At trial, the parties focused on Soares's breach of warranty claim under the Magnusson-

11  Moss Warranty Act ("MMWA").  The SAC alleges that the defendants "violated the Magnusson-

12  Moss Act . . . by advertising and writing 'deceptive warranty' that does not conform to the

13  requirements of Magnusson."  SAC ¶ 95 (Dkt. Nos. 129, 130).  It asserts violations of express,

14  implied, and statutory contract warranty.  *Id.* ¶¶ 87, 94.

15     The MMWA states that "[i]t shall be a violation of section 45(a)(1) of this title for any

16  person to fail to comply with any requirement imposed on such person by this chapter (or a rule

17  thereunder) or to violate any prohibition contained in this chapter (or a rule thereunder)."  15

18  U.S.C. § 2310(b).  15 U.S.C. § 2310(d)(1) states that "a consumer who is damaged by the failure

19  of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or

20  under a written warranty, implied warranty, or service contract, may bring suit for damages and

21  other legal and equitable relief."  However, only claims which total over $50,000.00, exclusive of

22  interests and costs, are cognizable in federal court.  15 U.S.C. § 2310(d)(3)(B).

23     In addition to a violation of the express provisions of the MMWA, a plaintiff may also

24  allege a state law breach of warranty under the MMWA.  *Clemens v. DaimlerChrysler Corp.*, 534

25  F.3d 1017, 1022 (9th Cir. 2008); 15 U.S.C. § 2301(7).  Soares must establish the elements of

26  breach of warranty by preponderance of the evidence.  *Cimino v. Fleetwood Enter., Inc.*, 542 F.

27  Supp. 2d 869, 882 (N.D. Ind. 2008).  To prove breach of warranty under either federal or state

28  law, Soares must prove both damages and causation between the alleged breach and the harm

United States District Court
Northern District of California

suffered by the plaintiff.  *See*, e.g., *Rooney v. Sierra Pac. Windows*, No. 10-CV-00905-LHK, 2011 WL 5034675, at *4, 8-9 (N.D. Cal. Oct. 11, 2011) aff'd, 566 F. App'x 573 (9th Cir. 2014) (MMWA claim must plead damages, as well as causation, as required by Article III); *see also McGarvey v. Penske Auto. Grp., Inc.*, 639 F. Supp. 2d 450, 456-57 (D.N.J. 2009) opinion vacated in part on other grounds, No. CIV.08-5610JBS/AMD, 2010 WL 1379967 (D.N.J. Mar. 29, 2010) (stating that a majority of federal courts have concluded that "a plaintiff is required to show that he has sustained actual damage, proximately caused by [the defendant's] failure to [comply] . . . with the MMWA") (internal quotations and citations omitted); *Holmes v. Home Depot USA, Inc.*, No. 1:06CV01527-SMS, 2008 WL 4966098, at *6 (E.D. Cal. Nov. 20, 2008) (causation of harm is an element in breach of warranty actions under California law).

With respect to SVR, the operative warranty in this case is the Settlement Agreement. Although the parties disagree as to whether SVR warranted labor and materials, or only labor, *see* Tr. 66:10-69:23, it is unnecessary to resolve this issue because Soares's claims fail under either interpretation.  Soares cannot establish breach of warranty, whether under 15 U.S.C. § 45(a)(1) or under state law for express or implied warranty, because he has not proved either damages or causation.

With regard to damages, Soares demonstrated that up to thirteen shingles were peeling off the roof.  *Id.* at 13:20-14:11.  According to his own evidence from Scudder, replacement of these shingles would cost less than $1,000.00.  This is far short of the $50,000.00 required under the MMWA.  *See* 15 U.S.C. § 2310(d)(3)(b).  Although Soares indicated that he elected to replace the roof instead of repair it, *see* Tr. 61:24-62:1, Scudder opined that the roof did not need to be replaced.[8]  This view is consistent with the fact that it would cost under $1,000 to replace the defective shingles – far less than the cost of re-roofing the house.  *Id.* at 24:4-5.  In addition,

---

[8] Over the objection of SVR and Village, I allowed Scudder's deposition testimony to be admitted even though Soares did not formally designate him as an expert.  *See* Dkt. No. 311.  I reasoned that SVR and Village had an adequate opportunity to cross-examine Scudder, and I limited his potential expert testimony to the opinions provided in his deposition and report attached to Soares's Rule 26 disclosures.  As discussed herein, Scudder's testimony was inconclusive at best. He did not opine that SVR or Village caused any damage to the roof, and testified that the identifiable problems on the roof would cost relatively little to fix in any event.

United States District Court
Northern District of California

1    Soares admitted that apart from Scudder's estimates, he did not know how much it would cost to

2    repair the roof.  *Id.* at 20:10-22:21.  Therefore, Soares has not adequately established damages

3    caused by the peeling or missing shingles.

4         Soares also took the position that damages were merited based upon the cost of properly

5    venting the roof or removing shingles that did not have enough nails put in them.  *Id.* at 24:6-19.

6    However, he did not present any evidence that SVR or Rangel installed the roof vents or that this

7    work was included in the roofing contract.  In addition, Scudder's opinion that the roof does not

8    meet current roof venting requirements is insufficient to establish that the vents need to be

9    replaced.  *See* Tr. Ex. 140 at 6.  Similarly, Soares's statements that the roof had a history of leaks

10   are not substantiated by any evidence that the roof actually leaks and must be repaired.  Scudder's

11   report tellingly found no evidence of water intrusion into the attic.  *Id.* at 7.

12        Soares also did not prove that the Drake property is located in a high wind zone, which

13   would call for five nails per shingle instead of the four that were used.  Tr. 18:11-19.  He offered

14   no other basis that would support a conclusion that these shingles needed to be re-installed or

15   replaced.

16        For these reasons, Soares has not established any certain, non-speculative damages to his

17   roof.  *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("The

18   general rule is, that all damages resulting necessarily and immediately and directly from the

19   breach are recoverable, and not those that are contingent and uncertain") (internal quotations and

20   citations omitted).

21        Further, Soares failed to establish causation between the alleged damages to the roof and

22   the actions of any defendant.  At trial, Soares appeared to argue that the peeling roof resulted from

23   a manufacturing defect, SVR's failure to use the proper amount of nails in each shingle, SVR's

24   failure to "slap" the shingles, or the installation of improper valleys by either SVR or Rangel.  *See*

25   Tr. 30:9-31:18, 36:3-37:25, 61:3-21.  However, the evidence presented does not support any of

26   Soares's assertions.

27        Soares did not present any other evidence of what procedures were used when the roof was

28   installed except the testimony of Jeffrey Lorono, who was unable to remember most of the

United States District Court
Northern District of California

23

1    pertinent details relating to the roof's installation.  Soares also did not present any evidence of the

2    proper procedure for installing a roof such as the one on the Drake property – for example, that the

3    shingles used should be slapped before installation.  Scudder could not determine whether there

4    was in fact a manufacturing defect in the shingles, or even whether there were any defects in the

5    roof installation at all.  *See* Scudder Depo. at 16.  Instead, Scudder repeatedly expressed an

6    opinion that further investigation was necessary.  Tr. Ex. 140 at 6, 8.

7         Soares's other arguments as to breach of warranty likewise lack the necessary causation.

8    Soares did not offer any proof that the valleys installed on his roof were defective or caused any

9    damages to the roof.  He was unable to prove that the shingles were peeling off his house as a

10   result of a defect in the labor or even materials supplied by SVR.  According to Soares's own

11   expert, shingles may peel off the roof because of raccoons, humans, or natural causes.  Scudder

12   Depo. at 15-16.  Finally, although Scudder's report indicated that Soares's chimney needed

13   additional caulking, that a blower vent cap needed to be replaced, and that the roof ventilation was

14   out of date, *see* Tr. Ex. 140 at 5-7, there is no indication that SVR or Rangel did any work on

15   Soares's chimney, or installed his blower vent cap or roofing ventilation.

16        As to defendants Rangel and Village, Soares did not establish the existence of any

17   warranty by Village for its work on the roof.  The parties had an oral contract and Rangel did not

18   testify that Village warranted its work.

19        Soares stated that his action against Village was based upon the "leaking copper work and

20   the valleys that he built on the roof."  Tr. 30:9-10.  However, Soares was unable to prove that

21   Rangel was responsible for the incorrectly built valleys, aside from the fact that he remembered

22   paying Rangel for that work.  *Id.* at 30:17-31:3.  Moreover, Soares's position is contradicted by

23   Jeffrey Lorono's testimony that SVR, and not Village, installed the valleys on the roof.  *Id.* at

24   45:20-23.  As discussed, Soares presented no evidence of water intrusion or leaking caused by the

25   work of SVR or Village.  In fact, during the bench trial he was unable to articulate any damages

26   resulting from Village's alleged breach of warranty or breach of contract.  *Id.* at 31:1-18.

27        Because Soares was unable to establish damages, causation, or any specific action of any

28   defendant that would constitute a breach of warranty, I rule in favor of the defendants and against

1    Soares on his second cause of action in the civil SAC.[9]

2        **B.  Breach of contract**

3        Soares's SAC alleges breach of contract, although it does not specify the actions that

4    constituted the breach or under what statute he brings his breach of contract action.  *See* SAC at 1.

5    "Under California law, the elements of a breach of contract claim are: (1) the existence of a

6    contract; (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

7    resulting damage to plaintiff."  *EPIS, Inc. v. Fid. & Guar. Life Ins. Co.*, 156 F. Supp. 2d 1116,

8    1124 (N.D. Cal. 2001).  Here, the only operative contracts are the Settlement Agreement, which

9    superseded the underlying contracts with SVR, and the oral contract with Village.

10       Soares failed to meet his burden with respect to elements (2), (3), and (4) of his breach of

11   contract claim with respect to any defendant.  For the reasons discussed above, Soares has not

12   established any wrongdoing that would constitute a breach on the part of Village or SVR related to

13   their work on his roof.  He also did not establish his injuries or other damages from the alleged

14   breach.  In addition, Soares did not present evidence that he substantially performed under either

15   contract, or that he was excused for his nonperformance.  Therefore, I find in favor of the

16   defendants and against Soares on the breach of contract claims as alleged in Soares's first cause of

17   action.[10]

18       **C.  Fraud, including mail fraud and wire fraud**

19       The third cause of action in Soares's SAC alleges fraud, including mail fraud and wire

20   fraud.  SAC ¶¶ 96-115.  Soares appears to have abandoned these claims, which he did not mention

21   in his pretrial or trial briefs, or during the bench trial.  Because Soares has not presented any

22

23   _____

24   [9] Due to this conclusion, I need not determine whether Soares's action is proper against the
     Loronos and Rangel individually, as opposed to against the corporate defendants with whom
     Soares contracted.

25   [10] In the SAC, Soares alleged breach of contract; breach of warranties; and fraud, including wire
     fraud and mail fraud.  SAC at 1.  Soares pled breach of warranties under the heading "Count 2,"

26   and fraud under "Count 3."  SAC ¶¶ 79-115.  Under his "First Count," Soares discussed the parties
     and the unities of interest between corporate and individual entities.  *Id.* ¶¶ 59-78.  He did not

27   plead breach of contract in the SAC outside of his general allegations.  Because of the liberal
     pleading standard for pro se parties, the fact that the remaining defendants in this action did not

28   file a motion to dismiss, and the fact that the "First Count" does not plead any cause of action, I
     consider the breach of contract claims to be Soares's first cause of action.

United States District Court
Northern District of California

1   evidence to support a finding of fraud on the part of any defendant, I rule in favor of SVR and

2   against Soares on the third cause of action in the SAC.

3        In sum, I will enter Judgment in favor of the defendants and against Soares in the civil

4   proceeding.

5   **II. ADVERSARY PROCEEDING**

6        **A. Soares's debt to SVR**

7        Soares's argument that he does not owe any money to SVR is premised on his misguided

8   understanding that he owes attorney's fees to Hollingsworth personally, and not to SVR. *See* Tr.

9   48:6-49:18. As repeatedly held in these proceedings, Soares owes attorney's fees to SVR, a valid

10  party to this proceeding. *See* Dkt. Nos. 306, 313. Regardless of whether the $5,697.00 sum is

11  owed as attorney's fees or as the balance due to SVR under the Settlement Agreement, the money

12  is nonetheless owed to SVR.

13       Soares admits that he owes $5,697.00. *See* Tr. Ex. 53 at 3. This is reflected by the fact

14  that he wrote a check to Hollingsworth for that amount, though he subsequently cancelled it in the

15  apparent belief that it was a preference payment that would be returned to the bankruptcy coffer.

16  Tr. 91:19-92:4. Therefore, I find that Soares's debt to SVR is $5,697.00.

17       **B. Soares's debt to Village**

18       Soares stated that he owes money to Village, but disputed the exact amount. Soares

19  conceded that he initially owed Village $13,124.54, and at trial even admitted that he owed the

20  sum of $14,517.36. *Id.* at 154:1-156:3. However, Soares's calculation of the amount owed to

21  Village offsets his debt to Village by $2,000.00, the amount Soares believes is necessary to make

22  repairs to his roof caused by Village's faulty work. *Id.*

23       I ruled against Soares on all claims against Village in the civil proceeding. Soares is not

24  entitled to any offset of his debt to Village because he did not establish that Village breached its

25  contract. The amount of debt that Soares owes to Village is $14,517.36.

26       **C. Non-dischargeability under 11 U.S.C. § 523(a)(2)(A)[11]**

27

28  _____

[11] The defendants' bankruptcy SAC initially pled that Soares's debt was non-dischargeable under
11 U.S.C. § 523(a)(2)(B), 11 U.S.C. §§ 548(a)(1)(A) and (B), 11 U.S.C. §§ 727(a)(2) and (4), and

United States District Court
Northern District of California

1    Creditors must prove exceptions to discharge under Section 523(a) by preponderance of

2    the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  11 U.S.C. § 523(a)(2)(A) states that

3    individual debtors are not entitled to discharge from any debt "for money, property, services, or an

4    extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false

5    representation, or actual fraud, other than a statement respecting the debtor's or an insider's

6    financial condition."  This section focuses on the intent of the parties at a discrete point in time:

7    when the debt was incurred.  *See*, e.g., *In re Lund*, 202 B.R. 127, 131 (B.A.P. 9th Cir. 1996).  As

8    Judge Weissbrodt clarified, to establish non-dischargeability under Section 523(a)(2)(A) "SVR

9    needs to show [] that Mr. Soares did not intend to pay the amounts due under the settlement

10   agreement *at the time he executed the settlement agreement*."  Bankr. Tr. at 20:13-16 (emphasis

11   added).  He added that Village's "burden is to prove that when Mr. Soares signed the contract with

12   Village, he didn't intend to pay." *Id.* at 20:24-25.

13   SVR did not meet its burden to prove that Soares did not intend to pay SVR at the time he

14   entered into the Settlement Agreement.  Soares paid a substantial portion of the funds owed under

15   the Settlement Agreement, all but $5,697.00.  *See* Tr. Ex. 155 at Ex. B; Tr. Ex. 300; Tr. Ex. 305.

16   In addition, Soares made several efforts to work out payment plans with SVR.  *See* Tr. Ex. 204;

17   Tr. Ex. 205; Tr. Ex. 206.  Therefore, the defendants have not met their burden of establishing non-

18   dischargeability under Section 523(a)(2)(A).

19   With respect to Village, there was no evidence presented, either direct or circumstantial,

20   that Soares did not intend to pay at the time of the oral contract.  In fact Soares testified that he

21   intended to pay and did pay a large portion of Village's billings.  Tr. 153:8-12.  Therefore, Village

22   also did not meet its burden under Section 523(a)(2)(A), and I do not find that its debt is non-

23   dischargeable under this subsection.

24   _____

25   California Civil Code § 3439.07.  Bankr. SAC (Bankr. Dkt. No. 205).  The 727 claims were
     dropped earlier in the proceedings, *see* Bankr. Dkt. 388 at 9, and during the bankruptcy adversary

26   trial proceedings the defendants acknowledged that 11 U.S.C. § 523(a)(2)(B) was not applicable.
     Bankr. Tr. at 5:4-6:10.  They also agreed with the bankruptcy court that the 11 U.S.C. §§

27   548(a)(1)(A) and (B) failed because only the Bankruptcy Trustee can bring those claims.  *Id.* at
     6:11-7:23, 12:10-11.  Similarly, counsel agreed not to pursue California Civil Code § 3439.07,

28   governing fraudulent transfers, because it is unclear that it would help the defendants.  *Id.* at 6:20-
     7:23, 12:10-11.

United States District Court
Northern District of California

**D.  Non-dischargeability under 11 U.S.C. § 523(a)(6)**

11 U.S.C. § 523(a)(6) states that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C.A. § 523(a)(6).  Therefore, in order to prove that a debt is dischargeable under Section 523(a)(6), a creditor must prove that a debtor's conduct was both willful and malicious.  Unlike the defendants' claims under Section 523(a)(2)(A), claims under Section 523(a)(6) are not evaluated as of a particular date.  Instead, the entire course of conduct between the parties is relevant.  *See U.S. Bank v. Franklin*, No. 05-05200, 2006 WL 2716128, at *3 (Bankr. E.D. Wash. Sept. 22, 2006) ("11 U.S.C. § 523(a)(6) covers a broader range of conduct than 11 U .S.C. 523 § (a)(2)(A)"); *In re Waag*, 418 B.R. 373, 375 n.4 (B.A.P. 9th Cir. 2009); *see also In re Kim*, No. ADV. 05-90027, 2006 WL 6810943, at *3 (B.A.P. 9th Cir. Mar. 17, 2006) (affirming determination of non-dischargeability under 523(a)(6) based upon pattern of fraudulent conduct); *In re Cohen*, No. 05-26783, 2010 WL 545720, at *5 (Bankr. W.D. Wash. Feb. 10, 2010) (applying 523(a)(6) based on multiple acts of deception).

The element of willfulness "requires proof that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself."  *In re Suarez*, 400 B.R. 732, 736-37 (B.A.P. 9th Cir. 2009).  This requirement is satisfied when the debtor either subjectively intended to inflict injury or believed that injury was substantially certain to result from his conduct.  *In re Jerich*, 238 F.3d 1202, 1208 (9th Cir. 2001).  In determining willfulness, the court "may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."  *In re Su*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002).

The "maliciousness" element is satisfied where the creditor proves that the debtor: (i) committed "a wrongful act; (ii) done intentionally; (iii) which necessarily causes injury; and (iv) is done without just cause or excuse."  *Su*, 290 F.3d at 1146–47.  An intentional breach of contract alone cannot establish willful and malicious injury under Section 523(a)(6).  *Jerich*, 238 F.3d at 1205.  Instead, the breach must be accompanied by some form of tortious conduct that gives rise

1    to the injury.  *Id.* at 1206.  This Court looks to California law to determine whether asserted

2    conduct is tortious.  *Id.*; s*ee also Lockerby v. Sierra*, 535 F.3d 1038, 1043 (9th Cir. 2008)

3    (523(a)(6) not met where party breached settlement agreement without good cause).  "Malicious

4    intent may be demonstrated by evidence that the debtor had knowledge of the creditor's rights and

5    that, with that knowledge, proceeded to take action in violation of those rights."  *Partners for*

6    *Health & Home, L.P. v. Seung Wee Yang*, 488 B.R. 109, 118 (C.D. Cal. 2012).

7            Activity that constitutes actionable fraud may satisfy both the willful and malicious

8    requirements of Section 523(a)(6).  *See In re Kirkland*, No. AZ–08–1143–EMoMK, 2008 WL

9    8444824, at *5 (B.A.P. 9th Cir. Nov. 26, 2008) (finding willful injury when "[debtor] had

10   willfully failed to give adequate notice for the express purpose of obtaining" excessive proceeds

11   from foreclosure sale, which also constituted fraudulent RICO scheme); *In re Kim*, 2006 WL

12   6810943, at *3 (affirming non-dischargeability under 523(a)(6) based on pattern of intentional

13   fraudulent concealment of property issues); *In re Diamond*, 285 F.3d 822, 828 (9th Cir. 2002)

14   (willful injury where there was underlying state court finding of fraud); *In re Bammer*, 131 F.3d

15   788, 793 (9th Cir. 1997) (523(a)(6) applies where party committed "knowing, intentional, and

16   damaging fraud"); *Jerich*, 238 F.3d at 1208-09; *In re Cooper*, No. 12–51833–CN, 2014 WL

17   1675751, at *5 (Bankr. N.D. Cal. Apr. 28, 2014).

18           Similarly, the use of an alter ego or sham corporation to commit wrongful acts such as

19   fraud may establish willful and malicious injury under Section 523(a)(6).  *In re Yarbrow*, 150 B.R.

20   233 (B.A.P. 9th Cir. 1993); *see also In re Wisniewski*, No. 2:12–bk–07266–EWH, 2014 WL

21   1796272, at *10 (Bankr. D. Ariz. May 5, 2014) ("Damages resulting from a fraudulent scheme or

22   a pattern of intentional conduct that necessarily results in an injury may be nondischargeable under

23   § 523(a)(6).").  California law, which this Court must apply, provides that "alter ego liability may

24   be imposed where (1) there is such a unity of interest and ownership that the individuality, or

25   separateness, of the [defendant] and corporation has ceased; and (2) the facts are such that an

26   adherence to the fiction of the separate existence of the corporation would ... sanction a fraud or

27   promote injustice."  *Whitney v. Arntz*, 320 F. App'x 799, 800 (9th Cir. 2009) (internal quotations

28   and citations omitted).

United States District Court
Northern District of California

Under California law, an action for fraud requires a showing that the defendant (i) made a misrepresentation; (ii) with knowledge of its falsity; (iii) with the intent to defraud or induce reliance; (iv) that the plaintiff justifiably relied upon; and (v) that the plaintiff suffered damage. *Tom Trading, Inc. v. Better Blue, Inc.*, 26 F. App'x 733, 736 (9th Cir. 2002).

### 1. Soares's debt to SVR

Soares's debt to SVR arises under the Settlement Agreement, but originates from Soares's Proposal and Contract with SVR for its roofing work on the Drake property.  By not paying the full amount owed to SVR under the Settlement Agreement, Soares committed a breach of contract. At the moment Soares made the agreement in question, it is unclear whether he intended to fulfill his obligations.  But it is abundantly clear that Soares extensively prepared to evade the debts prior to entering into the agreements, and his actions since incurring the debts demonstrate a pattern of fraudulent conduct that belies his intent to avoid paying them.

Soares's fraudulent conduct begins with his use of NZH and OCC.  As set forth in the findings of facts, NZH and OCC were Soares's alter egos.  Soares used these corporations not for a benign purpose, but in order to engage in wrongful conduct.  Soares admitted that he formed the corporations for the purpose of avoiding homeowners' association lawsuits.  Bankr. Tr. at 38:1-6. In the past, he persuaded the Superior Court that he was not liable to third party debtors on the basis that OCC and not he was a party to the contract.  Tr. Ex. 146; Tr. 174:22-176:22.  As discussed, however, NZH and OCC were sham corporations with no real distinction from Soares as an individual.  On more than one occasion, Soares incurred personal debts using these corporations and disclaimed individual liability on the basis that NZH or OCC was the debtor.

In this case, Soares falsely represented to SVR that OCC was a separate entity from himself, which SVR relied upon in signing the Proposal and Contract and later the Settlement Agreement.  Soares knew that OCC was his alter ego, but intended that SVR believe otherwise. SVR has suffered financial damages as a result of this misrepresentation, combined with Soares's refusal to pay personally and his later actions that ultimately divested OCC of all assets.  Around the time of the original contract with SVR, Soares refinanced the Drake property, OCC's only asset, adding more secured debt to the property.  Tr. 93:6-95:10.  Later, Soares conveyed both the

1    property and the corporation to himself before dissolving the corporation and filing for bankruptcy

2    in 2009.  *See* Tr. Ex. 127; Bankr. Tr. at 42:9-44:10.  Soares then filed the notice of automatic stay,

3    admitting that the debt to SVR is his own and that OCC was his alter ego.  Tr. Ex. 213.  This filing

4    brought the corporations under the umbrella of the bankruptcy proceedings and prevented SVR

5    from proceeding with its case against OCC in the Superior Court.  Through his manipulation of

6    the sham corporation, Soares defrauded SVR in an intentional attempt to avoid personal liability

7    for his debts.

8         Soares's other actions also provide circumstantial evidence of his plan to defraud SVR.

9    Before the state court action, Soares hid from the Loronos when they attempted to collect his

10   debts, and then falsely claimed that he did not sign the Proposal and Contract with SVR.  Tr.

11   248:10-24.  During the bench trial, Soares made incorrect claims that the corporations waived all

12   claims under the Settlement Agreement by filing against him individually.  Tr. 87:1-90:9.

13   Throughout these proceedings Soares continued to maintain that SVR owes $10,000.00 in

14   insurance money to him, even though he did not own the insurance policy.  Tr. 126:12-128:2,

15   221:18-222:4.  Lastly, Soares brought the current civil action, originally in New Jersey, for over

16   $11 million in damages, although there is no evidence of wire or mail fraud or of any damages that

17   would reasonably amount to $11 million.  The damages in Soares's civil case could at the most

18   amount to around $1,000 – .0001 of the amount sought.  At trial, no damages at all were proven.

19   *See Hughes v. Arnold*, 393 B.R. 712, 718 (E.D. Cal. 2008) *aff'd sub nom. In re Hughes*, 347 F.

20   App'x 359 (9th Cir. 2009) (initiating and prosecuting claim was "willful and malicious insofar as

21   [the] conduct was unreasonable, frivolous, vexatious and in bad faith").  Soares's repeated reliance

22   on absurd and patently incorrect arguments indicates a bad faith attempt to avoid his debts to SVR

23   by any possible means.  Each of these acts constitutes a wrongful and intentional attempt to avoid

24   paying SVR.  They necessarily caused financial injury to SVR, and were done without just cause

25   or excuse.

26        Taken together, all of Soares's above-described actions establish a plan to avoid paying his

27   debt to SVR and are wrongful acts that satisfy the maliciousness requirement of Section 523(a)(6).

28   In addition, the evidence demonstrates that these actions were willful, as Soares's scheme belies a

United States District Court
Northern District of California

31

clear intent that SVR not be paid for its work on the Drake property as well as knowledge that SVR was financially injured by his actions. Therefore, Soares's debt to SVR is non-dischargeable pursuant to Section 523(a)(6).

### 2. Soares's debt to Village

As discussed above, NZH was formed by Soares as an alter ego. With the case of Village, Soares initially indicated to Rangel that he personally was a party to the contract. Tr. 240:9-17. Later, he falsely claimed that NZH was the entity that owed Village for the sheet metal work. Tr. Ex. 220 at 2, 6. As with SVR, Soares's use of a sham corporation to avoid his debt to Rangel, even though Soares entered the contract personally, supports a finding of both willful and malicious behavior. This ultimately injured Village financially when Soares did not pay for its services.

In addition, Soares, acting through NZH, attempted to divest Village of standing by acquiring its dba when it lapsed, made unsubstantiated claims that he did not owe money to Village because Rangel was unlicensed, and falsely asserted that there was no contract with Village at all. *See* Tr. Ex. 151; Tr. 154:18-21, 243:3-23. Each of these actions constitutes an intentional and wrongful act that caused injury to Village through Soares's failure to pay. Soares had no just cause or excuse to act in this way, and instead appears to have resorted to these tactics in order to avoid paying Village. For these reasons, Soares's debt to Village is non-dischargeable under Section 523(a)(6).

### E. Attorney's Fees

SVR seeks attorney's fees pursuant to Federal Rule of Bankruptcy Procedure 7008(b), which previously required a "request for attorney's fees always to be pleaded as a claim in an allowed pleading." [12] FED. R. BANKR. P. 7008 advisory committee's notes. However, in 2014 this subsection was deleted. *Id.* Attorney's fees are now governed by Federal Rule of Bankruptcy Procedure 7054(b)(2). *Id.* This states that "Rule 54(d)(2)(A)-(C) and (E) [of the Federal Rules of Civil Procedure] applies in adversary proceedings except for the reference in Rule 54(d)(2)(C) to

---

[12] During the bankruptcy proceedings, counsel for Village conceded that it has no basis for attorney's fees for Village or Rangel. *See* Bankr. Tr. at 65:12-14.

United States District Court
Northern District of California

Rule 78." FED. R. BANKR. P. 7054(b)(2).  The advisory committee's comments state that in accordance with Federal Rule of Civil Procedure 54(d)(2)(A) and (B), "a claim for attorney's fees must be made by a motion filed no later than 14 days after entry of the judgment unless the governing substantive law requires those fees to be proved at trial as an element of damages. When fees are an element of damages, such as when the terms of a contract provide for the recovery of fees incurred prior to the instant adversary proceeding, the general pleading requirements of this rule still apply." FED. R. BANKR. P. 7008 advisory committee's notes.

In this case, SVR has pleaded that it is entitled to attorney's fees pursuant to the terms of the Settlement Agreement.  Bankr. SAC at 16-18.  The Settlement Agreement clearly provides that "[i]n the event any action is necessary to enforce any of the terms, covenants or conditions of this release, the prevailing party shall, in addition to any other recovery, recover his, its, or their reasonable attorneys' fees and costs."  Tr. Ex. 201 at 4.  Therefore, SVR is entitled to attorney's fees, and shall file a motion no later than 14 days from entry of judgment in this case.  Soares will have an opportunity to file an opposition to the motion for attorney's fees fourteen days thereafter, and SVR may reply seven days after that.

**IT IS SO ORDERED**.

Dated: January 12, 2015

WILLIAM H. ORRICK
United States District Judge